UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ANTHONY A. KUKLINSKI                                              Plaintiff

v.                                         Civil Action No. 3:14-cv-00843-RGJ-CHL

STEVEN TERNER MNUCHIN, United                                    Defendant
States Secretary of the Treasury

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Kuklinski brings this action against Defendant Steven Mnuchin, in his

capacity as United States Secretary of the Treasury ("Secretary"),[1] alleging that Defendant violated

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), when the Secretary retaliated

against Kuklinski for opposing workplace sexual harassment. [DE 83, Am. Compl. at ¶¶ 43–49].

Kuklinski further asserts a breach-of-contract claim arising from Defendant's alleged breach of a

mediation agreement. *Id.* at ¶¶ 66–71. Defendant now moves for summary judgment. [DE 108].

The matter is fully briefed and ripe for judgment. [*See* DE 118, Response; DE 122, Reply]. For

the reasons below, the Court **GRANTS** Defendant's Motion.

## I.      BACKGROUND

### A.      Factual Background

From 2004 until 2011, Kuklinski worked as a supervisory police inspector at the United

States Bullion Depository (the "Depository") in Fort Knox, Kentucky. [DE 117-3, Anthony

---

[1] This action was originally filed in 2013 against the United States Department of the Treasury and then-Secretary Jacob J. Lew in the United States District Court for the District of Columbia. [*See* DE 1]. On November 18, 2014, the D.C. District Court dismissed the Department of the Treasury as a defendant and transferred the action to this Court. [DE 27; DE 28]. Steven T. Mnuchin became Secretary on February 13, 2017. Pursuant to Federal Rule of Civil Procedure 25(d), Steven Mnuchin is thus substituted as Defendant in this action. However, because Kuklinski brings this action against the Secretary in his official capacity, this Order will reference the position of Secretary rather than the Secretary as an individual.

Kuklinski Dep. 61:13–14, Nov. 17, 2016; DE 117-5, Ex. 7 at 1374]. In that role, Kuklinski supervised three lieutenants, six sergeants, and about 48 other employees. [DE 108-13, Anthony Kuklinski Dep. 34:20-23, Nov. 17, 2016; DE 117 at 1275].

When Kuklinski was a supervisor, one of Kuklinski's subordinates—referred to in the record as "Harassed Officer"—was repeatedly harassed by another subordinate, referred to as "Harassing Officer." [DE 117 at 1275]. Harassing Officer allegedly spied on Harassed Officer at her home and told her that he dreamt he was suffocating her. *Id.* Harassing Officer also purportedly used the Depository's surveillance equipment to spy on Harassed Officer at work. *Id.* at 1276.

Harassed Officer eventually discovered that Harassing Officer was using the Depository's surveillance equipment to spy on her, prompting her to report the harassment. *Id.* Harassed Officer first informed her superior (and Kuklinski's subordinate) Lieutenant Lee Booth of the situation. *Id.* Though Booth confirmed Harassing Officer's misconduct by reviewing video footage recorded on the Depository's camera, Booth declined to discipline Harassing Officer. *Id.* A few months later, Harassing Officer spied on Harassed Officer again. *Id.* When Harassed Officer learned of Harassing Officer's continued harassment, she reported it to Kuklinski. *Id.* Booth confirmed Harassing Officer's misconduct and later completed an incident report documenting the events. *Id.* at 1277.

With a record of Harassing Officer's improper surveillance on file, upper management—specifically, the Depository's legal counsel, Irwin Ansher—investigated Harassed Officer's claims of sexual harassment. [DE 117-20, Ex. 22 at 1712]. Upper management selected Inspector John Seiple to conduct the investigation. *Id.*

At the close of the investigation, Kuklinski reviewed Seiple's findings and determined that Harassing Officer should be removed, and later drafted a proposal to that effect. [DE 117-1, Ex. 2 at 1298, 1314]. The proposal was circulated between human-resources workers, the Depository's attorneys, and other Depository officials. *Id.* at 1311–14.

Upper management rejected Kuklinski's proposal to remove Harassing Officer and decided instead to either reprimand or suspend Harassing Officer. [DE 117 at 1280]. When Kuklinski insisted that removal was the only discipline that would end Harassing Officer's misconduct, upper management removed Kuklinski as the officer in charge of disciplining Harassing Officer. *Id.* Kuklinski's removal came shortly after Trent Keltner, president of the Officers' union, informed Chief of U.S. Mint Police, Dennis O'Connor, and the Depository's Field Chief, Bert Barnes, that Keltner believed Kuklinski was biased against Harassing Officer because Kuklinski had an inappropriate personal relationship with Harassed Officer. *Id.* at 1280, 1282.

Meanwhile, Harassing Officer submitted a rebuttal to his proposed discipline. *Id.* at 1280. He claimed that Harassed Officer perjured herself, that management conducted an unauthorized investigation into Harassing Officer's purported misconduct, that there was a hostile work environment at the Depository, and that Harassed Officer had an improper relationship with Kuklinski. *Id.* Ultimately, Deputy Chief Bill Bailey issued Harassing Officer a letter of reprimand. [DE 117-8, Ex. 10 at 1414].

Harassing Officer continued to harass Harassed Officer, so Kuklinski advised Harassed Officer that she should contact the Equal Employment Office ("EEO") for guidance.[2] [DE 180-13, Anthony Kuklinski Dep. 131:21–132:1, Nov. 17, 2016]. Harassed Officer contacted an EEO

---

[2] To help Harassed Officer pursue her claims, Kuklinski provided a declaration to the EEO. [DE 117 at 1285]. Otherwise, Kuklinski was not involved in Harassing Officer's harassment suit.

counselor and filed a charge against the Depository on September 3, 2010. [DE 117 at 1282]. Harassed Officer subsequently settled her claims. *Id.* at 1288.

While Harassed Officer's claims were pending, the Depository contracted Carol Nichols, an independent investigator, to conduct two investigations. Kuklinski claims that both investigations targeted him. Nichols's first investigation began on July 27, 2010 and focused on assessing Harassed Officer's allegations and Harassing Officer's rebuttal allegations, including the rebuttal allegation that Kuklinski had an inappropriate relationship with Harassed Officer.[3] [DE 117-8 at 1407–37]. Nichols's second investigation, initiated on September 23, 2010, focused on uncovering possible management misconduct. [DE 117-12, Ex. 14 at 1465–66]. O'Connor's memorandum appointing Nichols to the investigation stated that O'Connor expected Nichols to investigate a wide range of perceived management misconduct, including misconduct unrelated to Kuklinski or his involvement in Harassed Officer's EEO complaint. *Id.*

A few months later, Nichols issued the results of her investigations. While Nichols found that no inappropriate relationship existed between Kuklinski and Harassed Officer, [DE 108-16, Def.'s Mem. Supp. Mot. Summ. J. Ex. 17, 1026–33], she concluded that management misconduct—including misconduct committed by Kuklinski—was pervasive at the Depository. [DE 108-12, Ex. 12 at 903–74]. Nichols also concluded that Kuklinski's aggressive management style contributed to the poor morale and performance of his subordinates. *Id.* at 964–67.

Based on Nichols's negative findings regarding Kuklinski's management style, Field Chief Connie Stringer[4] spoke with Kuklinski about relieving him of his supervisory duties "pending a

---

[3] While both parties appear to agree that Nichols determined that the allegation that Kuklinski had an inappropriate relationship with Harassing Officer was false, neither party has submitted Nichols's findings or any other evidence supporting that position.

[4] Stringer replaced Barnes as Field Chief during Nichols's investigation. [DE 108-8, Connie Stringer Dep. 26:25–27:13, Nov. 16, 2016].

management inquiry." [DE 117 at 1284]. The record is unclear about whether Stringer suspended Kuklinski's supervisor duties; but even if she did, she decided to allow Kuklinski to resume performing his supervisory duties on February 25, 2011, about one month after she originally met with him about revoking his supervisory duties. *Id.* at 1285.

On April 5, 2011, upper management began to investigate Kuklinski's responses to his security clearance questionnaire, which ultimately caused the suspension of his clearance.[5] [DE 108-1 at 806]. The investigation concerned whether Kuklinski failed to file federal income tax returns in 2008 and 2009, and whether he failed to disclose outside employment activities. [DE 108-13, Anthony Kuklinski Dep. 114:19–23, Nov. 17, 2016; DE 117-3, Anthony Kuklinski Dep. 159:15–20, Nov. 17, 2016]. Initially, at O'Connor's request, the Office of the Inspector General ("OIG") investigated Kuklinski's questionnaire. The OIG concluded its investigation on May 17, 2011 and found evidence that substantiated the allegations against Kuklinski. [DE 117-11, Ex. 13 at 1457–63]. Bailey then directed Commander Paul Constable to review the OIG's findings. [DE 117 at 1286]. Constable recommended that Stringer review the report and determine whether Kuklinski's security clearance should be suspended. *Id.* at 1287. Months later, management informed Kuklinski that his security clearance was suspended. [DE 117-5, Ex. 7].

While Kuklinski's security clearance was under review, he was relieved of his law enforcement authority and relegated to working in a maintenance building. [DE 117-6, Bill Bailey Dep. 51:7–52:4, Dec. 6, 2016]. Kuklinski could not enter the building he usually worked in while his clearance was in jeopardy. *Id.* at 52:5–9.

---

[5] The five-year security clearance questionnaire asks questions that the Office of Personnel Management uses to determine whether an employee can maintain his or her security clearance at the Depository. [DE 108-13, Anthony Kuklinski Dep. 114:2–18, Nov. 17, 2016]. Kuklinski completed the questionnaire in November 2010. *Id.* at 114:2–4.

Two important events occurred on March 1, 2012. First, management informed Kuklinski that his security clearance was reinstated but that he still could not enter the main security building without Stringer's permission. [DE 117-5, Ex. 7 at 1375]. Bailey explained that Kuklinski remained relegated to the maintenance building because of his aggressive management style. [DE 117-6, Bill Bailey Dep. 48:5–9, Dec. 6, 2016]. Second, management notified Kuklinski that he was being assigned to the Investigations and Intelligence Branch, Operations and Training Division, at the United States Mint Headquarters in Washington, D.C. [DE 117-5, Ex. 7 at 1376–77]. Management explained that Kuklinski was reassigned due to his "history of intimidating and aggressive behavior towards his subordinates." [DE 108-28, Ex. 29].

Based on these events, Kuklinski contacted an EEO counselor on March 21, 2012. [DE 117 at 1291]. He alleged that management relegated him to the maintenance building and reassigned him to work in Washington, D.C. because of his involvement in Harassed Officer's harassment claim. *Id.* at 1286, 1290.

Kuklinski attempted to settle his EEO charge through mediation. *Id.* at 1292. During Kuklinski's first mediation, held May 1, 2012, Kuklinski's counsel produced photographs of Kuklinski's workplace and asserted that an employee who is subjected to a demeaning work environment can be entitled to monetary damages.[6] *Id.* Because federal regulations prohibit photography at the Depository, Stringer drafted an incident report documenting Kuklinski's misconduct and opened an administrative investigation into the matter.[7] [DE 117-21, Ex. 23]. At some point during settlement discussions, Kuklinski provided his medical records to Ansher who,

---

[6] Kuklinski claims in his statement of facts that, after the first mediation, management forced him to work in the "paint room" of the maintenance building. [DE 117 at 1292]. Kuklinski, however, fails to direct the Court to any evidence proving that the relocation occurred.

[7] Kuklinski was issued a letter of reprimand. [DE 117 at 1290].

in turn, submitted them to a medical expert, Dr. Neil Presant. [DE 117 at 1293]. Ansher also provided Dr. Presant with a copy of Kuklinski's job description and asked Dr. Presant to conduct a fitness-for-duty assessment. [DE 117-4, Ex. 6 at 1345–1364]. After reviewing Kuklinski's records, Dr. Presant issued a report concluding that Kuklinski was physically and mentally unfit to work as a police officer. [DE 117-4 at 1366]. Upon receiving that report, Ansher—despite Kuklinski's counsel's insistence that it remain confidential—submitted it to Bailey and Stringer. *Id.* at 1365–66. Stringer assessed the report and informed Kuklinski that he would need to complete a fitness-for-duty exam.[8] *Id.* at 1368–69.

### B. Procedural History

Kuklinski initiated this action on September 27, 2013, and later submitted an Amended Complaint on January 24, 2017. [DE 83]. Considering the Amended Complaint and Kuklinski's other filings collectively, Kuklinski's retaliation claims are:

- Defendant revoked Kuklinski's authority to discipline Harassing Officer on March 16, 2010 because, on February 1, 2010, he proposed that Harassing Officer be removed from his position at the Depository.

- Because Kuklinski informed Harassed Officer on June 7, 2010 that she could seek guidance from the EEO regarding Harassing Officer's misconduct, Defendant:

  - Contracted Nichols to initiate an administrative investigation into Harassed Officer's allegations and Harassing Officer's rebuttal allegations on July 27, 2010;

  - Contracted Nichols to initiate an administrative investigation into possible management misconduct at the Depository on September 23, 2010;

  - Stripped Kuklinski of his supervisory duties in January 2011;

  - Forced Kuklinski to perform administrative tasks and to work in the break room of the maintenance building in March 2011;

  - Reassigned Kuklinski to a position in Washington, D.C. in March 2011.

- Because Kuklinski filed a charge with the EEO on March 21, 2012, Defendant:

---

[8] The exam was cancelled. [DE 117-1 at 1297, 1316].

    o Filed an incident report in May 2012 and initiated an investigation in July 2012 regarding Kuklinski's alleged unlawful photograph at the Depository;

    o Ordered Kuklinski to undergo a fitness for duty exam in September 2013.

*Id.* at ¶¶ 7–49.  Kuklinski also claims that Defendant breached a contract it entered into with Kuklinski when Defendant failed to keep Kuklinski's medical records confidential.  *Id.* at ¶¶ 66–71.  Kuklinski seeks compensatory and punitive damages, along with other types of relief, as a remedy for Defendant's alleged misconduct.[9]  *Id.* at ¶¶ a–i.

   The parties engaged in discovery, and Defendant moved to dismiss Kuklinski's retaliation claim insofar as it challenged Defendant's investigation into and subsequent suspension of Kuklinski's security clearance.  [DE 38-1, Def.'s Mem. Supp. Partial Mot. Dismiss].  In its motion, Defendant asserted that challenges to an executive agency's decision to investigate, suspend, or revoke a federal employee's security clearance are non-justiciable because, under United States Supreme Court precedent, such decisions are within the broad discretion of the executive branch.  *Id.* at 268 (quoting *Dep't of the Navy v. Egan*, 484 U.S. 518, 527–29 (1988)).

   On August 21, 2015, this Court entered a Memorandum Opinion granting Defendant's Partial Motion to Dismiss.  [DE 43, Mem. Op.].  Relying on *Egan*, this Court held:  "To the extent Kuklinski's Title VII claims contest the merits of the security-clearance investigation and suspension, the Court is without jurisdiction to hear the dispute."  *Id.* at 315.

   Discovery has closed, and Defendant now moves for summary judgment on Kuklinski's remaining Title VII claims and as his claims for constructive discharge and breach of contract.  [DE 108, Def.'s Mot. Summ. J.].  Kuklinski responded [DE 118], and Defendant replied [DE 122].

---

[9] The Amended Complaint also alleged claims for constructive discharge and intentional infliction of emotional distress, but Kuklinski later withdrew those claims.  [DE 83 at ¶¶ 50–57, 58–65; DE 79, Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Am. Compl. at 520].

## II.    LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts demonstrating a material issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion."  *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations.  *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  The Court must view the evidence and draw all reasonable inferences in a light most favorable to the nonmoving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). But the nonmoving party must do more than show some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).  Instead, the nonmoving party must present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Liberty Lobby*, 477 U.S. at 252.

# III.    DISCUSSION

## A.    Title VII Retaliation

Kuklinski has submitted no direct evidence substantiating his claim for retaliation, so the Court will consider the circumstantial evidence he has presented.  To survive summary judgment on a claim of Title VII retaliation based on circumstantial evidence, a plaintiff must demonstrate (1) that he engaged in a protected activity, (2) his employer knew of that activity, (3) the employer then took an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse action.  *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  As the Sixth Circuit has held:

> If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action.  The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination.

*Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).

Defendant concedes that Kuklinski has established the first and second elements of his *prima facie* case.  [DE 108-1 at 819].  As a result, the Court's analysis of Kuklinski's *prima facie* case is limited to the third and fourth elements.  As to the third element, the Sixth Circuit has held that in the context of a Title VII retaliation claim, an employer commits an "adverse employment action" when it takes an action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Garner v. Cuyahoga Cty. Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009) (citation omitted).  Other courts have suggested that actions like removing an employee from a project committee or subjecting the employee to "gratuitous investigations" can constitute adverse actions in the context of a Title VII retaliation claim.  *See Bridgewater v. Michigan Gaming Control Bd.*, 282 F. Supp. 3d 985, 1000–01 (E.D. Mich. 2017) (citing *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013)).

To satisfy the fourth element of a retaliation claim, a plaintiff must establish causation between the protected activity and adverse employment action by "produc[ing] sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citations omitted). "[E]vidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* (citation omitted).

While the Sixth Circuit "has not adopted a uniform approach on whether causal connection may be established solely on the basis of temporal proximity," recent cases suggest that "temporal proximity alone is sufficient [to establish a causal connection] where the temporal proximity is significant." *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 736 (W.D. Ky. 2013) (citations omitted). "Cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months." *Nguyen*, 229 F.3d at 567; *see also Brown*, 942 F. Supp. 2d at 736 (three months was close enough temporal proximity to support an inference of causation); *McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 965 (6th Cir. 2004) (thirteen days supported an inference of causation). However, a six-month separation between the protected activity and the adverse action does not necessarily establish a causal connection. For example, in *Nguyen*, the Court noted that "the fact of temporal proximity alone was not particularly compelling, because the plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the plaintiff's version of the events." 229 F.3d at 567; *see also Clay v. United Parcel Service, Inc*., 501 F.3d 695 (6th Cir. 2007) (six months was insufficient to establish causal connection); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (four months could not establish a causal connection).

There is thus no bright-line rule on when temporal proximity alone is enough to support an inference of causation. Generally, if "an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a casual connection for the purposes of satisfying a *prima facie* case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* The "burden of establishing a *prima facie* case in a retaliation action is not onerous," but is a burden nonetheless. *Nguyen*, 229 F.3d at 564 (citation omitted).

Because Kuklinski asserts that he engaged in three separate protected activities and that such activities produced eight instances of retaliation, the Court will address each allegation separately.

### 1. *Removal from Position of Disciplining Officer*

Kuklinski first complains that Defendant retaliated against him by revoking his authority to discipline Harassing Officer. Kuklinski argues that if he not proposed terminating Harassing Officer, Kuklinski would not have been removed from his position. [DE 118 at 1742–43].

The parties do not dispute that Defendant removed Kuklinski as disciplining officer, and at least one sister court has reasoned that permanently removing an employee from a committee constitutes an adverse action for a Title VII retaliation claim. *See Bridgewater*, 282 F. Supp. 3d at 1001. Compared with *Bridgewater*, the actions taken in this case—*i.e.*, Defendant's decision to remove Kuklinski as disciplining officer—are both more severe and directly related to the claims at issue. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) ("[T]he EEOC

has consistently found retaliatory work assignments to be a classic and widely recognized example of forbidden retaliation." (internal quotation marks and citation omitted)); *Dendinger v. Ohio*, 207 F. App'x 521, 527 n.6 (6th Cir. 2006) (noting the broad definition of "adverse employment action" after *Burlington N. & Santa Fe Ry. Co.*). Kuklinski's permanent removal as disciplining officer was thus clearly an adverse action for purposes of Title VII.

The undisputed facts show that Kuklinski proposed terminating Harassing Officer on February 1, 2010 and was removed from his position of disciplining officer approximately one-and-a-half months later. [DE 117 at 1278–80]. Thus, the temporal proximity between the alleged protected activity and adverse action satisfies the causation element of Kuklinski's *prima facie* case. *See Brown*, 942 F. Supp. 2d at 736; *see also Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that temporal proximity satisfied the causation requirement when adverse action occurred "just over three months" after protected activity).

As a result, the Court must examine (1) whether Defendant has articulated a legitimate, nondiscriminatory reason for removing Kuklinski as disciplining officer, and, (2) if so, whether Kuklinski has established that Defendant's reason is pretext for discrimination. *Penny*, 128 F.3d at 417. Defendant argues—and the record reflects—that Kuklinski was removed as disciplining officer because of allegations that Kuklinski had an inappropriate relationship with Harassed Officer and that he would therefore be biased against Harassing Officer. [DE 117 at 1280]. Accordingly, Defendant has met its burden, and the issue becomes whether Kuklinski has shown that Defendant's proffered reason: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (citation omitted). Kuklinski has offered no argument or evidence to rebut Defendant's legitimate reason for its

action; instead, Kuklinski generally argues that the evidence used to establish causation—*i.e.*, temporal proximity—can prove pretext. [DE 118 at 1745]. He is mistaken. Indeed, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (citation omitted). Kuklinski therefore fails to establish that Defendant's legitimate reason for removing him as disciplining officer is pretext for discrimination. Thus, Defendant is entitled to summary judgment on this claim.

### 2. *Nichols's First Investigation*

Next, Kuklinski argues that Defendant retaliated against him when it hired Nichols to investigate Harassing Officer's rebuttal allegation that Kuklinski had an inappropriate relationship with Harassed Officer. Kuklinski claims that Defendant began this investigation because Kuklinski advised Harassed Officer to seek EEO guidance. [DE 118 at 1743].

Like Kuklinski's first claim, Kuklinski has set out a *prima facie* case of discrimination with respect to this allegation. The Sixth Circuit has held that an employer's "gratuitous investigations" can constitute an adverse action. *Bridgewater*, 282 F. Supp. 3d at 1000–01. Even if Defendant's investigation of Harassing and Harassed Officer's allegations was "gratuitous," the investigation began on July 27, 2010—approximately two months after Kuklinski first informed Harassed Officer that she should seek guidance from the EEO. [DE 117-8]. Accordingly, the temporal proximity between the alleged protected activity and adverse action is sufficient to satisfy the causation element of Kuklinski's *prima facie* case. *See Brown*, 942 F. Supp. 2d at 736.

Kuklinski's claim fails, however, at the pretext phase. Defendant explains that it initiated the investigation into Harassing and Harassed Officers' respective allegations because their allegations were serious. [DE 108-1 at 824]. Defendant's position is underscored by the fact that it directed Nichols to investigate all of Harassing Officer's allegations, not just the one that

involved Kuklinski. *Id.* at 823. The burden thus shifts to Kuklinski to establish that the reason is pretextual. *Penny*, 128 F.3d at 417. Kuklinski's argues that the allegations could not have been serious because the OIG declined to investigate them, which, Kuklinski insists, demonstrates that Defendant had no reason to conduct the investigation other than to burden Kuklinski. [DE 108-1 at 829]. However, the OIG's decision not to investigate an allegation does not necessarily mean that such an allegation is not serious. Because Kuklinski presents no other coherent argument for pretext, Defendant is entitled to summary judgment on this claim.

### 3.     *Nichols's Second Investigation*

Next, Kuklinski alleges that Defendant retaliated against him when it hired Nichols to investigate possible management misconduct at the Depository. Kuklinski claims that Defendant started this investigation because Kuklinski advised Harassed Officer to seek EEO guidance. [DE 118 at 1745].

Kuklinski has established a *prima facie* case for this charge. As noted, Kuklinski advised Harassed Officer to seek EEO guidance on June 7, 2010, and Defendant initiated the investigation regarding possible management misconduct at the Depository on September 23, 2010—about three months later. (*See* DE 108-13, Anthony Kuklinski Dep. 131:21–132:1, Nov. 17, 2016; DE 117-12, Ex. 14 at 1465–66). Thus, the temporal proximity between the alleged protected activity and adverse action satisfies the causation element of Kuklinski's *prima facie* case. *See Singfield*, 389 F.3d at 563.

Even so, Kuklinski's claim fails at the pretext phase. Defendant asserts that it began the investigation into possible management misconduct at the Depository because it had reason to believe that poor management contributed to ongoing morale issues among the Depository's employees. [DE 108-1 at 804; DE 108-12, Ex. 12 at 914]. The record illustrates that Defendant

suspected Kuklinski's aggressive management style negatively affected Depository employees as early as May 2009. [DE 108-3, Ex. 2]. Defendant was therefore justified in initiating a thorough investigation directed at uncovering management misconduct. Thus, Defendant has met its burden, and Kuklinski fails to mount a persuasive argument showing that Defendant's reason for its purported retaliatory conduct is pretext for discrimination. Defendant is thus entitled to summary judgment on this claim.[10]

#### 4. *Removal of Kuklinski's Supervisory Duties*

Kuklinski next asserts that Defendant retaliated against him when it revoked Kuklinski's supervisory authority. [DE 118 at 1743]. Kuklinski again complains that Defendant took this action because Kuklinski advised Harassed Officer to seek EEO guidance. *Id.*

Kuklinski fails to set forth a *prima facie* case with respect to this charge. Stringer informed Kuklinski that he was being relieved of his supervisory authority in late January 2011, more than six months after Kuklinski advised Harassed Officer to seek EEO guidance. [DE 117 at 1284; DE 108-13, Anthony Kuklinski Dep. 131:21–132:1, Nov. 17, 2016]. As discussed, Kuklinski cannot rely on temporal proximity alone to establish a causal connection between his protected activity and Defendant's alleged retaliation, and he presents no other argument or evidence on the causation element of his *prima facie* case. *See Mickey*, 516 F.3d at 525. Defendant is thus entitled to summary judgment on this claim.

---

[10] In the context of a different claim, Kuklinski argues that Defendant's reason for initiating this investigation is pretext because employee morale was low before and after Kuklinski was in the position. [DE 118 at 1753–54]. But whether morale issues existed before and after Kuklinski's role as an inspector is irrelevant to whether Defendant's reason for starting the investigation "(1) has no basis in fact, (2) did not actually motivate the Defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler*, 317 F.3d at 576. The Court will not re-examine an employer's nondiscriminatory business decisions or otherwise tell an employer how to conduct its business. *Duggan v. Orthopaedic Inst. of Ohio, Inc.*, 365 F. Supp. 2d 853, 861–62 (N.D. Ohio 2005) (internal quotation omitted).

### 5. *Forcing Kuklinski to Work in Maintenance Building*

Next, Kuklinski argues that Defendant retaliated against him when it investigated and ultimately suspended his security clearance. The investigation began in April 2011, shortly after Kuklinski submitted a declaration in Harassed Officer's EEO case. [DE 1085-13, Anthony Kuklinski Dep. 114:19-23, Nov. 17, 2016; DE 117-3, Anthony Kuklinski Dep. 159:15-20, Nov. 17, 2016; DE 117 at 1285]. Thus, the Court assumes that Kuklinski's claim is that, had he not submitted the declaration, Defendant would not have investigated his security clearance questionnaire or later suspended his security clearance.

This Court explicitly ruled in a prior order that "[t]he merits underlying the investigation and suspension of the security clearance cannot serve as grounds for a justiciable claim under Title VII." [DE 43 at 315–18]. Accordingly, Defendant is entitled to summary judgment on this claim.

### 6. *Seeking to Relocate Kuklinski to Washington, D.C.*

Kuklinski claims that Defendant retaliated against him when it sought to relocate him to a position in Washington, D.C. He argues that Defendant took this action because Kuklinski submitted a declaration in Harassed Officer's EEO case. [DE 117 at 1285].

The evidence is insufficient to set forth a *prima facie* case of retaliation for this claim. Kuklinski does not explicitly address the causal connection between his alleged protected activity and Defendant's purported adverse action, so the Court will assume that Kuklinski relies on temporal proximity to establish the causation element of his claim. This reliance is misplaced. The undisputed facts show that Kuklinski submitted the declaration in Harassed Officer's case in February 2011, and Defendant did not attempt to relocate him until March 2012. *Id.* Since Kuklinski fails to present other arguments or evidence establishing the causation element of his *prima facie* case, Defendant is entitled to summary judgment on this claim.

### 7.    *Administrative Investigation Regrading Unlawful Photography*

Next, Kuklinski asserts that Defendant retaliated against him when it initiated an investigation about whether Kuklinski unlawfully photographed the interior of the Depository and reprimanded him for his actions. [DE 118 at 1744]. According to Kuklinski, Defendant took this action because Kuklinski initiated his EEO case. *Id.*

Kuklinski has presented sufficient evidence to establish a *prima facie* case with respect to this charge. Kuklinski initiated his EEO case on March 21, 2012, and Defendant began investigating Kuklinski's alleged unlawful photography in May 2012. *Id.* at 1291–92. Temporal proximity satisfies the causation requirement because the protected activity and retaliatory event occurred two months apart. *See Singfield*, 389 F.3d at 563. And as noted above, initiation of an investigation constitutes a retaliatory action. *See Bridgewater*, 282 F. Supp. 3d at 1000–01.

Even so, Kuklinski's claim fails at the pretext phase. As Defendant explained in its brief, federal regulations prohibit photography on the property of the Depository without the permission of the Director of the Mint. [DE 108-1 at 814 (citing 31 C.F.R. § 91.10)]. Kuklinski took photographs at the Depository without permission and presented them to Defendant during mediation, prompting an investigation and eventual reprimand. [DE 117 at 1293]. Given that Kuklinski's conduct appeared to violate federal regulations, Defendant's decision to investigate that conduct and reprimand Kuklinski was legitimate. *See Swanson v. Livingston Cty.*, 121 F. App'x 80, 85 (6th Cir. 2005) (affirming the district court's conclusion that employer was justified in investigating employee's alleged violation of an internal regulation). Kuklinski also fails to show that Defendant's reason for investigating and reprimanding him for unlawfully photographing Depository property is pretext for discrimination. Kuklinski complains that Defendant's proffered reason is pretext because the Depository, in a separate instance, "permitted

[Kuklinski's] counsel to have photographs" of the Depository taken "for use as evidence in the trial of this case." [DE 118 at 1754]. But the fact the Depository later permitted Kuklinski's counsel to have photographs taken of the Depository does not excuse Kuklinski's violation of 31 C.F.R. § 91.10. Defendant is therefore entitled to summary judgment on this claim.

### 8. *Ordering Kuklinski to Undergo Fitness-for-Duty Exam*

Finally, Kuklinski asserts that Defendant retaliated against him when it ordered Kuklinski to undergo a fitness-for-duty exam. *Id.* at 1737–38. Kuklinski claims that Defendant took this action because Kuklinski initiated a case with the EEO. *Id.* at 1744. Kuklinski initiated his EEO case on March 21, 2011, and Defendant asked Kuklinski to conduct a fitness-for-duty exam in September 2013. [DE 117 at 1291, 1295].

Like some of his other claims, Kuklinski does not explicitly address the causal connection between his alleged protected activity and Defendant's purported adverse action, so the Court will assume that Kuklinski relies on temporal proximity to establish the causation element of his claim. The undisputed facts show that Kuklinski submitted the declaration in Harassed Officer's case in February 2011, and Defendant did not seek to relocate him until March 2012—more than a year later. *Id.* at 1285. Since Kuklinski fails to present any other evidence establishing the causation element of his *prima facie* case, Defendant is entitled to summary judgment on this claim.

### B. Breach of Contract

Kuklinski also asserts a breach-of-contract claim, which arises from Defendant's alleged failure to abide by the terms of a mediation agreement it entered into with Kuklinski during the parties' settlement attempts. [DE 83 at ¶¶ 66–71]. Specifically, Kuklinski claims that Defendant violated the confidentiality provisions of the agreement when it failed to keep photographs and medical records Kuklinski produced during the mediation private. *Id.* at ¶¶ 69–70.

Defendant responds that this Court lacks jurisdiction over this claim for two reasons. First, Defendant argues that under the Tucker Act, the United States Court of Federal Claims has exclusive "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." *See* 28 U.S.C. § 1491(a)(1). Defendant notes that, although the Little Tucker Act allows a district court to hear such a claim when its monetary value is less than $10,000.00, *see* 28 U.S.C. § 1346(a)(2), Kuklinski admitted during discovery that his breach-of-contract claim seeks monetary damages greater than $10,000.00. [DE 108-19, Ex. 20]. Thus, according to Defendant, Kuklinski's claim cannot be heard in federal district court. [DE 108-1 at 833–34]. Second, Defendant asserts that even if Kuklinski seeks less than $10,000.00, his claim still fails because a court only has jurisdiction over a contract under the Tucker Act if the contract at issue can be "fairly interpreted as mandating compensation by the Federal Government." *Id.* at 834–35 (quoting *Holmes v. United States*, 657 F.3d 1303, 1309 (Fed. Cir. 2011)). Defendant explains that *Higbie v. United States*, 778 F.3d 990 (Fed. Cir. 2015) holds that the United States' breach of confidentiality provisions in mediation agreements does not give rise to damages, so such claims are not actionable under the Tucker Act. [DE 108-1 at 835].

Kuklinski maintains that neither of Defendant's jurisdictional arguments is persuasive. Kuklinski argues that he can waive his ability to receive damages greater than $10,000.00 to bring his claim within the purview of the Little Tucker Act. [DE 118 at 1755–56]. Kuklinski also asserts that Defendant's reliance on *Higbie* is misplaced because *Higbie* holds that breaches of mediation-related confidentiality agreements do not *usually* support monetary damages because non-monetary remedies—such as exclusion of the information disclosed—are *usually* available. *Id.* at 1756–77. Kuklinski argues that he cannot obtain a non-monetary remedy based on Defendant's

supposed breach because, among other things, "[e]xclusion cannot erase the[] events [that injured Kuklinski] and remedy the damage to [Kuklinski's] professional reputation and health." *Id.* at 1777. Thus, Kuklinski concludes, because non-monetary damages are unavailable to him, the rationale of *Higbie* does not apply, and the mediation agreement here can be interpreted as requiring monetary damages. *Id.*

Even if Kuklinski properly waived his ability to seek monetary damages greater than $10,000.00 for his breach-of-contract claim,[11] his claim is still not actionable under the Tucker Act pursuant to the Federal Circuit's reasoning in *Higbie*. The facts of *Higbie* are nearly identical to the facts of this case. There, the parties participated in alternative-dispute resolution after the plaintiff initiated an EEO claim. *Higbie*, 778 F.3d at 991. During mediation, the parties agreed that all information produced during mediation would be confidential under a boilerplate confidentiality provision, which read: "Any documents submitted to the mediator(s) and statements made during the mediation are for settlement purposes only." *Id.* at 992. When the plaintiff later sued, he claimed that the defendant breached the confidentiality agreement when it disclosed information produced during mediation. *Id.* The U.S. Court of Appeals for the Federal Circuit affirmed the lower court's dismissal of the plaintiff's breach-of-contract claim, reasoning that the boilerplate confidentiality provision did not contemplate monetary damages because non-monetary remedies—*i.e.*, exclusion of the improperly disclosed information during later proceedings—were available and there was no other indication that the parties intended for a breach of the confidentiality provision to result in monetary damages. *Id.* at 994–95.

---

[11] The Court questions whether Kuklinski can admit in evidence that he is seeking more than $10,000.00 in damages on a claim and then withdraw that admission in his briefing. Even so, because the Court can adequately dispose of Kuklinski's claim pursuant to *Higbie*, it will assume Kuklinski's waiver was appropriate.

As with *Higbie*, the confidentiality provision here simply states: "Any documents submitted to the mediator and statements made during the mediation are for settlement purposes only." [DE 108-18, Ex. 19 at 1083]. That provision contemplates a non-monetary remedy—*i.e.*, exclusion of information—and the record contains no indication that the parties intended for a breach of the provision to create monetary damages.

Kuklinski's attempt to distinguish *Higbie* is unpersuasive. Kuklinski complains that he cannot obtain an adequate non-monetary remedy based on Defendant's supposed breach because "[e]xclusion cannot erase the[] events" that injured Kuklinski. [DE 118 at 1757]. But the same would be true for the plaintiff in *Higbie*. Once the information is disclosed, the injury has occurred. Yet, the Federal Circuit concluded that a non-monetary remedy was available and that, in the absence of some other indication that the parties contemplated a monetary remedy for a breach of the provision, the contract did not contemplate monetary damages. *Higbie*, 778 F.3d at 994–95. Thus, Kuklinski's claim is not actionable under the Tucker Act and must be dismissed.

## IV.    CONCLUSION

For all these reasons, and being otherwise sufficiently advised, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [DE 108] is **GRANTED**. This is a final and appealable order.

Cc:    Counsel of record